Brian S. King, #4610
Brent J. Newton, #6950
Samuel M. Hall, #16066
**BRIAN S. KING, P.C.**
420 East South Temple, Suite 420
Salt Lake City, UT 84111
Telephone: (801) 532-1739
Facsimile: (801) 532-1936
brian@briansking.com
brent@briansking.com
samuel@briansking.com

Attorneys for Plaintiffs

THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| TRAVIS H., and B.H.,<br><br>        Plaintiffs,<br><br>vs.<br><br>BLUE CROSS BLUE SHIELD of KANSAS, EXTRUSIONS INC., and the EXTRUSIONS INC. MEDICAL BENEFITS PLAN.,<br><br>        Defendants. | COMPLAINT |

Plaintiffs Travis H. and B.H., through their undersigned counsel, complain and allege against Defendants Blue Cross Blue Shield of Kansas ("BCBSKS"), Extrusions Inc. ("the Plan Administrator") and the Extrusions Inc. Medical Benefits Plan ("the Plan") as follows:

## PARTIES, JURISDICTION AND VENUE

1. Travis and B.H. are natural persons residing in Johnson County, Kansas. Travis is B.H.'s father.

1

2. BCBSKS is an independent licensee of the nationwide Blue Cross and Blue Shield Association and was the third-party claims administrator, as well as the fiduciary under ERISA for the Plan during the treatment at issue in this case.

3. At all relevant times BCBSKS acted as agent for the Plan and the Plan Administrator.

4. The Plan Administrator is the designated administrator for the Plan.

5. The Plan is a self-funded employee welfare benefits plan under 29 U.S.C. §1001 *et. seq.*, the Employee Retirement Income Security Act of 1974 ("ERISA").

6. Travis was a participant in the Plan and B.H. was a beneficiary of the Plan at all relevant times. Travis and B.H. continue to be participants and beneficiaries of the Plan.

7. B.H. received medical care and treatment at Cascade Academy ("Cascade") from June 1, 2021, to December 9, 2021. Cascade is a treatment facility located in Wasatch County Utah, which provides sub-acute inpatient treatment to adolescents with mental health, behavioral, and/or substance abuse problems.

8. BCBSKS, acting in its own capacity or through its affiliate New Directions Behavioral Health, denied claims for payment of B.H.'s medical expenses in connection with her treatment at Cascade.

9. This Court has jurisdiction over this case under 29 U.S.C. §1132(e)(1) and 28 U.S.C. §1331.

10. Venue is appropriate under 29 U.S.C. §1132(e)(2) and 28 U.S.C. §1391(c) based on ERISA's nationwide service of process and venue provisions, because BCBSKS does business in Utah through its network of affiliates, and the treatment at issue took place in Utah.

11. In addition, the Plaintiffs have been informed and reasonably believe that litigating the case outside of Utah will likely lead to substantially increased litigation costs they will be responsible to pay and that would not be incurred if venue of the case remains in Utah. Finally, given the sensitive nature of the medical treatment at issue, it is the Plaintiffs' desire that the case be resolved in the State of Utah where it is more likely their privacy will be preserved.

12. The remedies the Plaintiffs seek under the terms of ERISA and under the Plan are for the benefits due under the terms of the Plan, and pursuant to 29 U.S.C. §1132(a)(1)(B), for appropriate equitable relief under 29 U.S.C. §1132(a)(3) based on the Defendants' violation of the Mental Health Parity and Addiction Equity Act of 2008 ("MHPAEA"), for an award of statutory damages against the Plan Administrator pursuant to 29 U.S.C. §1132(c) based on the failure of the Plan Administrator and its agents to produce within 30 days documents under which the Plan was established or operated, an award of prejudgment interest, and an award of attorney fees and costs pursuant to 29 U.S.C. §1132(g).

## **BACKGROUND FACTS**

### **B.H.'s Developmental History and Medical Background**

13. When B.H. was six years old, she was diagnosed with ADHD. B.H. was able to make and keep friends, but often struggled with impulsivity and acting without thinking. B.H. also began restricting her food intake around this time.

14. B.H. met with numerous psychiatrists and therapists and was given a variety of medications to treat her ADHD, but these were largely ineffective. B.H. started exhibiting other concerning behaviors such as skin picking.

15. As B.H. grew older she exhibited increasing levels of depression and anxiety and lost all her friends. She was further diagnosed avoidant restrictive food intake disorder, and a repetitive hair pulling disorder called trichotillomania. B.H. also started struggling academically.

16. B.H.'s medications continued to be adjusted with little effect. She committed acts of self-harm, did not maintain her personal hygiene, experienced gender identity issues, and suffered crippling anxiety which interfered with her activities of daily living.

17. B.H. was admitted to a facility called ViewPoint Center, after which she received further treatment at Cascade.

**Cascade**

18. B.H. was admitted to Cascade on June 1, 2021.

19. In a letter dated June 3, 2021, New Directions Behavioral Health denied payment for B.H.'s treatment on BCBSKS's behalf. The letter gave the following justification for the denial:

> Cascade Academy asked for approval to provide care for you. You are functioning at your baseline. Your care team reports that you are able to function day to day. You do not have a medical condition that requires this level of care. You are not thinking about harming anyone. You do not require residential care to keep safe. You are not at high risk to be hospitalized. You can be treated in a less restrictive level of care. Please follow up with your care team for the next steps in your care.

20. On November 16, 2021, Travis submitted an appeal of the denial of payment for the denial of payment of B.H.'s treatment at Cascade.[1] Travis reminded BCBSKS that he was entitled to certain protections under ERISA during the review process, including a full,

---

[1] Travis submitted the initial appeal to New Directions Behavioral Health. He resubmitted the appeal on January 20, 2022, this time to BCBSKS. No substantive changes were made to the resubmission.

fair, and thorough review of the appeal conducted by appropriately qualified reviewers which took into account all of the information he submitted and which gave him the specific reasons for the adverse determination, referenced the specific plan provisions on which the denial was based, and gave him the information necessary to perfect the claim.

21. He asked that the reviewer have experience treating individuals with B.H.'s diagnoses and that they be trained in the details of MHPAEA to properly respond to his arguments concerning a violation of the statute. He also asked for a copy of any documentation related to the reviewer's decision, including any internal case notes or reports.

22. Travis expressed concern that the denial of payment for B.H.'s treatment was a violation of MHPAEA. He wrote that MHPAEA compelled insurers to ensure that benefits for behavioral health services were offered at parity with benefits for medical and surgical services in the same classification.

23. He identified skilled nursing, subacute rehabilitation, and inpatient hospice as some of the medical or surgical analogues to the mental health treatment B.H. received.

24. Travis identified two potential violations of MHPAEA. The first was BCBSKS's imposition of requirements found only in its clinical criteria to deny the treatment, while, to his knowledge, having no comparable requirements or criteria for analogous medical or surgical facilities. The second was BCBSKS's imposition of acute level requirements to evaluate the medical necessity of a subacute level of care.

25. Travis asked BCBSKS to perform a MHPAEA compliance analysis on the Plan to ensure that the Plan was acting in accordance with the statute. Travis asked to be provided with physical copies of the results of this analysis.

26. Travis argued that B.H.'s treatment was medically necessary and he included copies of

 B.H.'s medical records as well as letters of medical necessity with the appeal.

27. In an assessment dated September 9, 2020, Micaela Wexler, DO, wrote in part:

> History of Present Illness/Interval History
>
> Patient has been evaluated in our office, and it has been determined that she requires a higher level of care than what can be provided in our office. Specifically, patient requires a long term treatment facility in order to learn to manage her symptoms of anxiety, which are currently severe, and include the following:
>
> -patient engages in self-harm behavior several times a day of scratching herself
> -she struggles with making decisions on what to eat, which results in restricted eating
> -patient's hair pulling has escalated
> -patient is not able to care for her personal hygiene - will go weeks between showers; will not brush her teeth or get deodorant
> -patient finds it difficult to make simple decisions, such as what to have for lunch
> -patient is unable to function in school; her curriculum has been pared down to just 4 core classes, and she is not able to participate at a level consistent with her intellectual ability
>
> Patient is being treated with medications, and therapy, but has not been able to make progress in any of these areas mentioned. She does not report acute suicidal ideation, so does not qualify for acute psychiatric care, which would not be helpful as it is short term.
>
> Patient does not have active suicidal ideation. She denies a plan, denies intent. She is simply not able to function in her daily living activities due to severe anxiety.

28. In a November 2020, psychoeducational evaluation, licensed psychologist Tish Taylor,

 PhD, wrote in part:

> [B.H.] requires a complex and comprehensive psychiatric treatment program with specialty treatment as accompanying components they are able to be incorporated. [sic] This could be in the form of a residential placement or intensive outpatient being followed by therapists and a psychiatrist within those programs or those programs coordinating with [B.H.]'s current psychiatrist. Family intervention and counseling is also needed which would coordinate [B.H.]'s treatment with parent

training and education. A facility or program that provides a holistic approach to all of the complexities of what [B.H.] is experiencing is recommended.

29. In a multidisciplinary report from ViewPoint Center, a short term stabilization facility B.H. attended prior to her admission to Cascade, her clinicians wrote in part:

> It is recommended [B.H.] continue their therapy in a RTC or similar out of home placement as previous placements in lesser levels of care have not been effective in re-directing their avoidant and self-harming behaviors. Therapy and residential care for [B.H.] needs to primarily focus on their ability to manage anxiety, relationship development, including peers and family members; developing and accessing prosocial coping skills; and completing their high school diploma. …

> Currently, [B.H.]'s prognosis is guarded, given the complexity of their current situation. With additional clinical resources around them, time is needed to accurately assess the outcome. Given their history and their current presentation, they would benefit from continued multidisciplinary services addressing difficulties. [B.H.] can continue learning the coping skills needed and how to apply them to everyday life.

> They require a level of services that is more comprehensive than can be provided in an outpatient program, or day treatment program. [B.H.] requires a multidisciplinary level of services addressing there psychiatric, psychological, and family difficulties. They need assistance working toward independence through educational, residential, and community services. [B.H.] does not currently possess the coping skills and resilience to function without this kind of significant structure and therapeutic assistance. Services should also be aimed at developing a strong sense of internal self-esteem, identity development, and social/emotional growth.

> [B.H.] requires a well-structured residential treatment facility that will aid in teaching, modeling, and reinforcing adaptive living and coping skills until they can be more resilient.

30. Travis wrote that it was the opinion of all B.H.'s treating professionals that her residential care was necessary and appropriate. He voiced his concern that BCBSKS would attempt to supersede the opinions of the clinical professionals who had worked with B.H. on a firsthand basis and actively witnessed the deterioration of her condition.

31. B.H.'s medical records showed that she continued to struggle with anxiety, food refusal, body focused repetitive behaviors, tics, self-harm, threats of suicide, self-isolating

behaviors, depression, gender identity issues, and poor insight, even while in the residential treatment environment.

32. Travis wrote that even if B.H. was at her baseline at certain times on particular days, this did not mean that she was emotionally regulated enough to step down to a lower level of care. He argued that the only reason B.H. was able to function day to day was because of the residential care she was receiving, and that this level of care was required to keep her safe and able to eventually transition home.

33. In addition Travis asked to be provided with a copy of all documents under which the Plan was operated, including all governing plan documents, the summary plan description, any insurance policies in place for the benefits he was seeking, any administrative service agreements that existed, any clinical guidelines or medical necessity criteria utilized in the determination (along with their medical or surgical equivalents, whether or not these were used), together with any reports or opinions regarding the claim from any physician or other professional, along with their names, qualifications, and denial rates (collectively the "Plan Documents").

34. In a letter dated February 23, 2022, BCBSKS upheld the denial of payment and gave the following statement from its reviewer.

- Cascade Academy asked for approval to provide care for [B.H.] and provided information.
- Admission was for treatment of unstable mood.
- [B.H.] was functioning at her baseline.
- There were no barriers to treatment at a lower level of care.
- There was support at home.

Recommended alternative level of care: psychiatric partial hospitalization.

As requested, we are providing the plan documents used in making this claim determination. This case was reviewed by Dr. Adam Ligas and Dr. Justin Liegmann. This decision brings the appeal process with BCBSKS to a close.

35. Travis received a partial response to his document request to BCBSKC. It provided the insurance plan booklet and some of the medical review documents Travis requested but BCBSKC did not provide the other documents and information he asked for.[2]

36. On June 20, 2022, Travis asked for the denial of payment to be reevaluated by an external review agency.

37. Travis argued that BCBSKC had not respected his rights under ERISA and had not cited to any specific plan language or criteria requirements to support its decision, had not meaningfully responded to any of the arguments he raised in the appeal process, had ignored his contention that the denial was a violation of MHPAEA, had failed to provide him with the information necessary to perfect the claim, and had not utilized appropriately qualified reviewers.

38. He wrote that BCBSKS had a fiduciary duty to act in his best interest, and asked that the external reviewer be appropriately qualified, and that they provide him with a full, fair, and thorough review, free from the errors BCBSKS had committed during the review process.

39. Travis contended that it was reductive for BCBSKS to argue that B.H.'s admission was for "treatment of unstable mood" or that she "was functioning at her baseline." He argued that B.H. was not able to be treated effectively at a lower level of care or properly addressed in a home environment. He wrote that he had raised these issues with BCBSKC, but it had refused to address his arguments.

---

[2] For a more complete list of provided items see paragraph 43 below.

40. He argued that B.H. did in fact meet the New Directions criteria BCBSKS had referenced, and addressed how these were satisfied point by point. Travis included updated copies of B.H.'s medical records with the appeal and argued that these further illustrated the medical necessity of B.H.'s treatment and showed ongoing issues such as "critically low" food intake resulting in headaches, dizziness, weakness, and brain fog. He again asked to be provided with a copy of the Plan Documents.

41. In a letter dated August 4, 2022, review agency KFMC upheld the denial of payment for B.H.'s treatment. The reviewer wrote that residential treatment was not the most appropriate setting for B.H.'s treatment. The reviewer appears to have predicated this decision to deny B.H.'s subacute treatment almost entirely on acute level factors.

42. For instance, the reviewer wrote that on B.H.'s admission, "the member did not present an imminent risk of harm to self or others. She denied suicidal or homicidal ideation. There is no indication of acute biomedical condition requiring a residential treatment experience."

43. The reviewer stated that B.H.'s diagnosis "did not support acute psychiatric concerns, risks of harm to self or others, nor other substantial biomedical conditions requiring a residential level of care," in addition, the reviewer referenced prior treatment B.H. had received, the cost of the program, and B.H.'s lack of desire to receive residential care as further justifications to deny payment.

44. The reviewer further claimed that while more than a thousand pages of documentation had been submitted with the appeal, the evaluation would focus on B.H.'s admission to Cascade as this was "most critical in understanding... whether the claimant required residential psychiatric treatment at that point in time..."

45. The reviewer appears to acknowledge that they disregarded most of the documentation Travis submitted and only (or at least primarily) evaluated materials concerning B.H.'s admission in their assessment, and in fact, the reviewer supports this finding by stating at the conclusion of their assessment:

> At the time of admission to Cascade Academy, documentation does not support acute psychiatric concerns, risks of harm to self or others, nor other substantial biomedical conditions requiring residential level of care. Admission to Cascade Academy was not medically necessary.

46. The Plaintiffs exhausted their pre-litigation appeal obligations under the terms of the Plan and ERISA.

47. As he had yet to receive all the documentation he requested, Travis made one last attempt to procure these materials by sending a request directly to the Plan Administrator. In a letter dated February 13, 2023, Travis asked to be provided with:

> • Disclosure of the identities of all individuals with clinical or medical expertise who evaluated the treatment for [B.H.] ... at Cascade, copies of those individuals' curriculum vitae, copies of any memoranda, emails, reports, or other documents reflecting the rationale of the reviewers in denying coverage for their claim;
> • A complete copy of both the medical necessity criteria utilized by BCBSKS in determining that [B.H.]'s treatment was not medically necessary and that treatment for them at a lower level of care was appropriate;
> • A complete copy of the medical necessity criteria utilized by the Plan for skilled nursing facilities, sub-acute inpatient rehabilitation treatment, and inpatient hospice treatment. This is necessary to allow me to carry out an evaluation of whether the Plan has complied with the requirements of the federal Mental Health Parity and Addiction Equity Act;
> • Copies of documents identifying the self-compliance analysis the Plan and BCBSKS have carried out to determine the extent to which they are complying with the federal Mental Health Parity and Addiction Equity Act.
> • Complete copies of any and all internal records compiled by BCBSKS and Extrusions, Inc. ("Extrusions") in connection with their claim including, but not limited to, telephone logs, memoranda, notes, emails, correspondence, or any other communications;
> • A copy of the summary plan description, master plan document, certificate of insurance, insurance policy, and any other document under which their insurance plan is operated;

&bull; Copies of any and all administrative service agreements, contracts or other documents which described and defined the relationship, rights and obligations of and between you, the plan administrator, and BCBSKS and;

&bull; Copies of documents identifying the processes, strategies, evidentiary standards, and other factors used to apply a nonquantitative treatment limitation with respect to medical/surgical benefits and mental health or substance use disorder benefits under the plan.

48. Travis received a letter from BCBSKS dated March 10, 2023, responding to this request. The letter stated that the requisite materials had already been provided in response to his level one appeal and no further documentation would be released. The letter summarized the prior production as:

- Your 2021 Comprehensive Major Medical Group Certificate
- The New Directions Behavioral Health (NDBH) 2021 Medical Necessity Criteria.
- The NDBH Contact Notes
- Copies of all claims from Cascade Academy
- The medical records NDBH and/or BCBSKS had in possession related to these services

49. The letter stated that the other requested documentation had not been used in the evaluation and denial of the claims and would not be provided.

50. The denial of benefits for B.H.'s treatment was a breach of contract and caused Travis to incur medical expenses that should have been paid by the Plan in an amount totaling over $135,000.

**FIRST CAUSE OF ACTION**

**(Claim for Recovery of Benefits Under 29 U.S.C. §1132(a)(1)(B))**

51. ERISA imposes higher-than-marketplace quality standards on insurers and plan administrators. It sets forth a special standard of care upon plan fiduciaries such as BCBSKS, acting as agent of the Plan, to discharge its duties in respect to claims processing solely in the interests of the participants and beneficiaries of the Plan. 29 U.S.C. §1104(a)(1).

52. BCBSKS and the Plan failed to provide coverage for B.H.'s treatment in violation of the express terms of the Plan, which promise benefits to employees and their dependents for medically necessary treatment of mental health and substance use disorders.

53. ERISA also underscores the particular importance of accurate claims processing and evaluation by requiring that administrators provide a "full and fair review" of claim denials and to engage in a meaningful dialogue with the Plaintiffs in the pre-litigation appeal process. 29 U.S.C. §1133(2).

54. The denial letters produced by BCBSKS do little to elucidate whether BCBSKS conducted a meaningful analysis of the Plaintiffs' appeals or whether it provided them with the "full and fair review" to which they are entitled.

55. BCBSKS failed to substantively respond to the issues presented in Travis's appeals and did not meaningfully address the arguments or concerns that the Plaintiffs raised during the appeals process.

56. The letters offer little clarification as to BCBSKS's reasoning behind its decision to deny payment beyond vague generalizations such as a declaration that B.H. was functioning at her baseline and she had a supportive home environment. BCBSKS did not elaborate on why these brief statements would constitute justifications to deny payment under the terms of the insurance contract.

57. BCBSKS and the agents of the Plan breached their fiduciary duties to B.H. when they failed to comply with their obligations under 29 U.S.C. §1104 and 29 U.S.C. §1133 to act solely in B.H.'s interest and for the exclusive purpose of providing benefits to ERISA participants and beneficiaries, to produce copies of relevant documents and information to claimants upon request, and to provide a full and fair review of B.H.'s claims.

58. The actions of BCBSKS and the Plan in failing to provide coverage for B.H.'s medically necessary treatment are a violation of the terms of the Plan and its medical necessity criteria.

59. While the presentation of alternative or potentially inconsistent claims in the manner that Plaintiffs state in their first, second, and third causes of action is specifically anticipated and allowed under F.R.Civ.P. 8, Plaintiffs contend they are entitled to relief and appropriate remedies under each cause of action.

## SECOND CAUSE OF ACTION

### (Claim for Violation of MHPAEA Under 29 U.S.C. §1132(a)(3))

60. MHPAEA is incorporated into ERISA and is enforceable by ERISA participants and beneficiaries as a requirement of both ERISA and MHPAEA. The obligation to comply with both ERISA and MHPAEA is part of BCBSKS's fiduciary duties.

61. MHPAEA requires ERISA plans to provide no less generous coverage for treatment of mental health and substance use disorders than they provide for treatment of medical/surgical disorders.

62. MHPAEA prohibits ERISA plans from imposing treatment limitations on mental health or substance use disorder benefits that are more restrictive than the predominant treatment limitations applied to substantially all medical and surgical benefits and also makes illegal separate treatment limitations that are applicable only with respect to mental health or substance use disorder benefits. 29 U.S.C.§1185a(a)(3)(A)(ii).

63. Impermissible nonquantitative treatment limitations under MHPAEA include, but are not limited to, medical management standards limiting or excluding benefits based on medical necessity; refusal to pay for higher-cost treatment until it can be shown that a

lower-cost treatment is not effective; and restrictions based on geographic location, facility type, provider specialty, or other criteria that limit the scope or duration of benefits for mental health or substance use disorder treatment. 29 C.F.R. §2590.712(c)(4)(ii)(A), (F), and (H).

64. The medical necessity criteria used by BCBSKS for the intermediate level mental health treatment benefits at issue in this case are more stringent or restrictive than the medical necessity criteria the Plan applies to analogous intermediate levels of medical or surgical benefits.

65. Comparable benefits offered by the Plan for medical/surgical treatment analogous to the benefits the Plan excluded for B.H.'s treatment include sub-acute inpatient treatment settings such as skilled nursing facilities, inpatient hospice care, and rehabilitation facilities.

66. When BCBSKS and the Plan receive claims for intermediate level treatment of medical and surgical conditions, they provide benefits and pay the claims as outlined in the terms of the Plan based on generally accepted standards of medical practice.

67. BCBSKS and the Plan evaluated B.H.'s mental health claims using medical necessity criteria that deviate from generally accepted standards of medical practice. This process resulted in a coverage disparity because the Plan denied coverage for mental health benefits when the analogous levels of medical or surgical benefits would have been paid.

68. As an example of disparate application of medical necessity criteria between medical/surgical and mental health treatment, BCBSKS's reviewers improperly utilized acute medical necessity criteria to evaluate the non-acute treatment that B.H. received. BCBSKS's improper use of acute inpatient medical necessity criteria is revealed in the

statements in BCBSKS's denial letters such as " You are not thinking about harming anyone."

69. This improper use of acute inpatient criteria was a nonquantitative treatment limitation that cannot permissibly be applied to evaluate the sub-acute level of care that B.H. received. The Plan does not require individuals receiving treatment at sub-acute inpatient facilities for medical/surgical conditions to satisfy acute medical necessity criteria in order to receive Plan benefits.

70. The treatment provided in an acute care environment is necessarily distinct from treatment provided in a non-acute environment. Utilizing acute criteria to evaluate a non-acute claim will result in a near universal denial of benefits, regardless of the medical necessity, clinical appropriateness, or nature of the treatment.

71. The Defendants cannot and will not deny that use of acute care criteria, either on its face or in application, to evaluate sub-acute treatment violates generally accepted standards of medical practice. They must and do acknowledge that they adhere to generally accepted standards of medical practice when they evaluate the medical necessity criteria of both mental health/substance use disorders and medical/surgical claims.

72. This use of acute criteria was not limited to BCBSKS's assessment, but also appears to have been the primary basis the external reviewer utilized to uphold the denial of payment.

73. Travis noted that BCBSKS restricted the availability of B.H.'s treatment by forcing it to comply with requirements contained only within proprietary criteria. Travis argued that not only did BCBSKS exempt comparable medical or surgical services from these

requirements, but it did not appear to have proprietary medical or surgical criteria for analogous medical/surgical care at all. Travis requested to be provided with these criteria if they existed but did not receive them.

74. BCBSKS and the Plan did not produce the documents the Plaintiffs requested to evaluate medical necessity and MHPAEA compliance, nor did they address in any substantive capacity the Plaintiffs' allegations that BCBSKS and the Plan were not in compliance with MHPAEA.

75. In fact, despite Travis's request that BCBSKS and the Plan conduct a parity compliance analysis and despite the direction from the Department of Labor that ERISA plan and claim administrators perform parity compliance analyses, BCBSKS and the Plan have not provided Travis with any information about whether they have carried out any parity compliance analysis and, to the extent that any such analysis was performed, BCBSKS and the Plan have not provided Travis with any information about the results of this analysis.

76. The violations of MHPAEA by BCBSKS and the Plan are breaches of fiduciary duty and give the Plaintiffs the right to obtain appropriate equitable remedies as provided under 29 U.S.C. §1132(a)(3) including, but not limited to:

(a) A declaration that the actions of the Defendants violate MHPAEA;

(b) An injunction ordering the Defendants to cease violating MHPAEA and requiring compliance with the statute;

(c) An order requiring the reformation of the terms of the Plan and the medical necessity criteria utilized by the Defendants to interpret and apply the terms of the Plan to ensure compliance with MHPAEA;

(d) An order requiring disgorgement of funds obtained by or retained by the Defendants as a result of their violations of MHPAEA;

(e) An order requiring an accounting by the Defendants of the funds wrongly withheld by each Defendant from participants and beneficiaries of the Plan as a result of the Defendants' violations of MHPAEA;

(f) An order based on the equitable remedy of surcharge requiring the Defendants to provide payment to the Plaintiffs as make-whole relief for their loss;

(g) An order equitably estopping the Defendants from denying the Plaintiffs' claims in violation of MHPAEA; and

(h) An order providing restitution from the Defendants to the Plaintiffs for their loss arising out of the Defendants' violation of MHPAEA.

## **THIRD CAUSE OF ACTION**

### **(Request for Statutory Penalties Under 29 U.S.C. §1132(a)(1)(A) and (c))**

77. BCBSKS, acting as agent for the Plan Administrator, is obligated to provide to participants and beneficiaries of the Plan within 30 days after written request, documents under which the Plan was established or operated, including but not limited to any administrative service agreements between the Plan and BCBSKS, the medical necessity criteria for mental health and substance abuse, and medical necessity criteria for skilled nursing and rehabilitation facilities.

78. In spite of Travis's written requests during the appeal process for BCBSKS to produce documents under which the Plan was operated, BCBSKS only partially complied with its obligation to produce to the Plaintiffs the documents under which the Plan was operated, including but not limited to any administrative service agreements between the Plan and

BCBSKS, the medical necessity criteria for mental health and substance abuse, and medical necessity criteria for skilled nursing and rehabilitation facility treatment within 30 days after they had been requested.

79. After BCBSKS only partially provided these materials, Travis sent one final letter dated February 13, 2023, to both BCBSKS and the Plan Administrator again requesting the documents which he was statutorily entitled to receive upon request.

80. BCBSKS responded to this request by stating that it would not provide any additional documentation beyond what it had already produced. Travis received no documentation from the Plan Administrator in response to his request.

81. The failure of the Plan Administrator and its agent BCBSKS, to produce the documents under which the Plan was operated, as requested by the Plaintiffs, within 30 days of Travis's written request for ERISA documents, provides the factual and legal basis under 29 U.S.C. §1132(a)(1)(A) and (c) for this Court to impose statutory penalties against the Plan Administrator up to $110 per day from 30 days from the date of each of these letters to the date of the production of the requested documents.

82. In addition, Plaintiffs are entitled to an award of prejudgment interest pursuant to U.C.A. §15-1-1, and attorney fees and costs pursuant to 29 U.S.C. §1132(g)

WHEREFORE, the Plaintiffs seek relief as follows:

1.  Judgment in the total amount that is owed for B.H.'s medically necessary treatment at Cascade under the terms of the Plan, plus pre and post-judgment interest to the date of payment;

2.  Appropriate equitable relief under 29 U.S.C. §1132(a)(3) as outlined in Plaintiffs' Second Cause of Action;

3.      For an award of statutory penalties of up to $110 a day against the Plan

        Administrator after the first 30 days for each instance of the Plan Administrator and

        its agent BCBSKS's failure or refusal to fulfill their duties, to provide the Plaintiffs

        with the documents they had requested.

4.      Attorney fees and costs incurred pursuant to 29 U.S.C. §1132(g); and

5.      For such further relief as the Court deems just and proper.

        DATED this 29th day of December, 2023.


                                                By ____s/ Brian S. King_____
                                                    Brian S. King
                                                    Attorney for Plaintiffs



County of Plaintiffs' Residence:
Johnson County, Kansas